NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241331-U

NO. 4-24-1331

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 2, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| JASON L. HILLS, | ) | No. 18CF450 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's denial of defendant's amended postconviction petition after a
         third-stage evidentiary hearing was not error.

¶ 2       Defendant, Jason L. Hills, was convicted of two counts of criminal sexual assault

(720 ILCS 5/11-1.20(a)(2) (West 2016)) and sentenced to five years' imprisonment on each

count, to be served consecutively. He now appeals from the trial court's denial of his amended

postconviction petition after a third-stage evidentiary hearing, claiming the denial was against

the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4       In October 2021, after his conviction was affirmed on direct appeal (see *People v.

Hills*, 2021 IL App (4th) 200220-U, ¶ 49 (*Hills I*)), defendant filed a postconviction petition,

claiming he was denied the effective assistance of trial counsel. In particular, defendant alleged

counsel rendered ineffective assistance by failing to (1) investigate and adequately cross-examine a witness regarding the victim's post-traumatic stress disorder (PTSD), (2) consult, retain, and call a forensic psychologist to testify at trial, and (3) introduce pharmacological evidence disputing the victim's claim she did not recall the sexual assaults from which the charges arose. The trial court summarily dismissed the petition at the first stage of postconviction proceedings. Defendant appealed, and this court reversed the trial court's summary dismissal and remanded the cause for second-stage postconviction review. *People v. Hills*, 2023 IL App (4th) 220141-U, ¶ 28 (*Hills II*).

¶ 5        Defendant thereafter filed an amended postconviction petition, which included two new claims. Specifically, defendant alleged trial counsel failed to (1) investigate and present expert testimony to contradict the victim's claim she was unconscious after consuming one tramadol pill and approximately three shots of alcohol and (2) present expert testimony to contradict the victim's claim that she suffered bruising because of the sexual assault. The trial court initially dismissed the amended petition. However, upon defendant's motion for reconsideration, the court permitted the amended petition to proceed to a third-stage evidentiary hearing.

¶ 6        At the third-stage hearing, Dr. Shiping Bao, a forensic pathologist, testified regarding the effects of alcohol and tramadol and the age of the bruises. Dr. Tetyana Kostyshyna, a forensic psychologist, testified regarding whether the State's expert's "methodology for diagnosis of PTSD was proper in this case and met the minimum requirements for forensic and psychological relations." Defendant's trial counsel testified to his trial strategy. After the hearing, the trial court entered a written order denying the amended petition.

¶ 7        This appeal followed. We note the facts of the underlying case are fully set forth

in *Hills I*, and *Hills II* discusses some of the claims before us. We reference only the relevant testimony from the third-stage hearing and trial in our analysis below.

¶ 8                                    II. ANALYSIS

¶ 9        On appeal, defendant contends the trial court's decision to deny postconviction relief following the third-stage evidentiary hearing was against the manifest weight of the evidence. Defendant argues the court erred by (1) observing in its denial order that the amount of evidence presented at trial and in the appellate court's previous opinion greatly exceeded the evidence contained in defendant's petition, (2) finding his expert witnesses were not credible, and (3) finding he failed to establish either prong necessary for a showing of ineffective assistance of counsel. Although we review the court's decision to deny postconviction relief for manifest error, we apply a hybrid standard of review when asked to consider ineffective assistance of counsel claims. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55. "[W]e defer to the trial court's factual findings and will disturb them only if they are against the manifest weight of the evidence but review *de novo* the court's ultimate determination of whether counsel rendered ineffective assistance." *Phillips*, 2017 IL App (4th) 160557, ¶ 55.

¶ 10                          A. Postconviction Proceedings

¶ 11        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)) "provides a mechanism for criminal defendants to challenge their convictions or sentences based on a substantial violation of their rights under the federal or state constitutions." *People v. Morris*, 236 Ill. 2d 345, 354 (2010). "Postconviction proceedings are not a continuation of, or an appeal from, the original case." *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Rather, a proceeding under the Act "is a collateral attack upon the prior conviction and affords only limited review of constitutional claims not presented at trial." *Harris*, 224 Ill. 2d at 124.

¶ 12    The Act establishes a three stage process for adjudicating a postconviction petition. *People v. English*, 2013 IL 112890, ¶ 23. At the third stage, unlike the first two, the allegations are not taken as true. Instead, "the circuit court serves as the factfinder, determining witness credibility, deciding the weight to be given testimony and evidence, and resolving any evidentiary conflicts." *People v. Harris*, 2025 IL 130351, ¶ 40. "The [defendant] has the burden to ultimately prove by a preponderance of the evidence that his constitutional rights were violated, warranting a new trial." *Harris*, 2025 IL 130351, ¶ 40. "Where a trial court's decision to deny a postconviction petition after a third-stage evidentiary hearing is based on disputed issues of fact that requires credibility determinations, we will reverse that decision only if it is manifestly erroneous." *Phillips*, 2017 IL App (4th) 160557, ¶ 55. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 13                    B. The Denial Order's Language

¶ 14    Defendant's claims here are based on the trial court's fact-finding and credibility determinations. Because the same judge presided over defendant's trial and third-stage hearing, we give the trial court the heightened deference it deserves, as it had the opportunity to observe trial counsel's conduct during the proceedings below. See *People v. Jacobazzi*, 398 Ill. App. 3d 890, 912 (2009). "This deferential standard is appropriate because the trial court is in the best position to observe and weigh the credibility of the witnesses." *Jacobazzi*, 398 Ill. App. 3d at 912. As a result, we will give the trial court's credibility determinations even greater deference when reviewing the record for manifest error.

¶ 15    The trial court's denial order found "there was substantially more evidence introduced at trial than the defendant stated in the pending petition" and "a complete summary of

all the evidence at trial is contained in the appellate court opinion attached to the People's response to the pending petition as People's Exhibit 1." Based on this, defendant argues the court manifestly erred in finding there was substantially more evidence at trial than what was included in his petition. However, the record shows the court was simply reiterating that its determinations must be made based on all the evidence presented, not merely what defendant included in his petition. "The circuit court has wide discretion in deciding what evidence to consider" as the finder of fact during a third-stage evidentiary hearing. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. Thus, the prefatory remarks in question were nothing more than a recognition that the court was not limited to considering solely the facts alleged in the petition and presented at the third-stage hearing and an observation that the appellate court's order affirming defendant's convictions on direct appeal provided a reliable summary of the trial evidence. See *Hills I*, 2021 IL App (4th) 200220-U, ¶¶ 4-20.

¶ 16                      C. The Trial Court's Credibility Determinations

¶ 17          Defendant next argues the trial court manifestly erred in finding his expert witnesses were not credible during the third stage hearing. As stated, "[m]anifest error is clearly evident, plain, and indisputable. [Citation.] Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *People v. Carter*, 2021 IL App (4th) 180581, ¶ 58. Further, as noted above, because this court also presided over defendant's trial, we will give even greater deference to its credibility determinations.

¶ 18                                      1. *Dr. Bao*

¶ 19          At the third-stage hearing, forensic pathologist Bao testified regarding his opinion of the effects of alcohol and tramadol, as well as the age of the victim's bruises. To provide context for Bao's testimony, we first summarize the relevant trial testimony provided by the

victim, J.A.W.

¶ 20    At defendant's trial, J.A.W. testified defendant came to her house at approximately 11 p.m. on January 22, 2017. During an earlier conversation, defendant indicated he "was kind of homeless" and needed a place to shower. J.A.W. asked whether he had any medication to help her "bad sciatic nerve problem." Defendant brought "some ibuprofen, the 800 kind, and a Tramadol," as well as a handle of whiskey. J.A.W. had made it "absolutely[,] [v]ery clear" to defendant "[they] were not having any kind of sexual activity." J.A.W. took the medication when defendant arrived, and over the next three hours she took three sips of whiskey from the bottle. Eventually, J.A.W. began feeling "overwhelmingly tired" and "woozy." She looked at her phone at 2:11 a.m. and thought, "[H]e's got to go." J.A.W. testified she did not remember much else until her son woke her up later that morning. During her testimony, J.A.W. identified a series of photographs taken at the hospital, which depicted bruises on her legs and arms. J.A.W. testified she did not have those bruises before defendant came to her house, and she had no idea how she received them.

¶ 21    Defendant contends Bao's testimony during the third stage hearing undercut J.A.W.'s credibility, arguing Bao discredited the assertion that "alcohol and Tramadol rendered [her] unconscious for 8 hours." During the third-stage hearing, defense counsel asked Bao whether consuming three sips of whiskey and one tramadol pill would cause someone to lose consciousness. Bao testified it would not. According to Bao, three sips of whiskey constituted less than one shot, and "[n]ormally a person would lose consciousness [after consuming] at least 15 shots." Bao further testified one pill of tramadol would not affect an individual's consciousness, saying, "In order to cause [a] problem, you have to take at least 10 pills."

¶ 22    In its denial order, however, the trial court observed several credibility concerns

surrounding Bao's testimony, including Bao's lack of awareness regarding Food and Drug Administration (FDA) warnings against using tramadol with alcohol and lack of knowledge regarding J.A.W.'s weight, history of alcohol use, how alcohol affects her, and whether she actually took tramadol on the night in question. Considering the court's well-founded concerns, defendant's efforts to challenge the court's credibility determination are woefully inadequate. The evidence does not confirm whether the pills J.A.W. consumed were ibuprofen or tramadol. J.A.W. described them as "a big, rounder pill. I assume that was ibuprofen 800 and there was a small pill, and I assume that was the Tramadol." At trial, defendant testified he brought two 800 milligram ibuprofen tablets, which he described as two large, oval shaped, white pills. Based on J.A.W.'s testimony, it is reasonable for a trier of fact to conclude the pills she received were not two of the same medication.

¶ 23       Additionally, the record does not support defendant's representation that J.A.W. claimed to be "unconscious" for eight hours. Instead, J.A.W. said she did not remember anything after looking at her phone at 2:11 a.m. and thinking it was time for petitioner to leave until she woke up later that morning. After J.A.W. reported the sexual assault to the police, other memories came back to her, which she characterized as occurring during the "eight hours" she was "unconscious." However, throughout the trial, the word "unconscious" was not used by any witness to describe the time between 2:11 a.m. and when J.A.W. woke up. Even trial counsel did not characterize J.A.W. as "unconscious," either in questioning or during closing arguments. Defendant now refers to her condition as "unconscious" to fit his false narrative.

¶ 24       Bao, in his capacity as an expert on forensic pathology, testified consuming three sips of whiskey and one tramadol pill would not cause an individual to lose consciousness. He rendered his opinion without reference to the person's size, weight, age, drinking habits, or

whether or when they had consumed food earlier, and if so, how much. Further, he rendered his opinion with no knowledge of the actual quantity consumed, instead using "three sips" as a unit of measurement. Bao's opinion did not contemplate the whiskey's proof or alcohol percentage, or whether the bottle defendant brought contained whiskey mixed with something else.

¶ 25        Bao's testimony regarding tramadol was similarly uninspiring. While Bao insisted Tramadol was "a relatively safe drug," he testified he did not regularly prescribe medication as part of his medical practice. Instead, he did so informally "for friends." Bao acknowledged "the FDA says not to drink alcohol with tramadol," but he insisted alcohol would not enhance the effects of tramadol. This opinion was contradicted by the registered nurse who examined J.A.W. at the hospital, who testified alcohol would "heighten the effect of the pain medication [tramadol]." Bao agreed his opinions regarding alcohol and tramadol did not account for how both could affect different people differently—Bao asserted he was talking about a "normal range." Despite the numerous shortcomings described above, Bao claimed his opinion on the combined effects of alcohol, ibuprofen, and tramadol on a person's consciousness carried a "more than 95 percent" degree of medical certainty.

¶ 26        After reviewing photocopies of photographs of J.A.W.'s bruises, Bao opined the different bruises ranged from two to seven days old based on their coloration. Bao insisted he could give this estimate with "more than 95 percent *** certainty." On cross-examination, Bao acknowledged he typically reviewed more than photographs when he was the primary pathologist assigned to a case. However, Bao said he did not need to look at the tissue beneath a bruise to determine its age because he was "good enough to tell the injuries." Bao conceded people bruise differently, but he testified there was "little difference" from one person to another. Bao also stated he had previously testified as an expert in just two cases involving surviving

victims. In every other instance, his conclusions relied on a full autopsy report in addition to photographs.

¶ 27                                                  2. *Dr. Kostyshyna*

¶ 28          Defendant contends Kostyshyna, a clinical psychologist who testified as an expert in forensic psychology, undercut the testimony of the State's expert witness, Malinda Vogel, regarding J.A.W.'s PTSD diagnosis.

¶ 29          At defendant's trial, Vogel, a licensed clinical professional counselor, testified as an expert qualified to evaluate post-traumatic stress. Vogel met with J.A.W. over the course of two days to determine what psychological impact the sexual assault had on her. Vogel testified J.A.W. exhibited all eight criteria recognized by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, as indicative of PTSD, which were (1) an identifiable traumatic event experienced directly by her, (2) intrusive thoughts related to the traumatic event, including "memories or flashbacks," (3) outside events triggering aspects of the trauma, (4) avoidance of potential reminders of the trauma, (5) negative mood changes and perceptions of herself and of the world, (6) changes in "physiological arousal and reactivity," such as breathing, heart rate, blood pressure, and ability to relax and be calm, (7) symptoms occurring at least a month following the trauma, and (8) symptoms having a "clinically significant impact" on her ability to function. In Vogel's professional opinion, J.A.W. suffered from PTSD.

¶ 30          Kostyshyna testified she reviewed Vogel's written report and concluded her methodology "didn't meet the minimal standards with the psychological and also forensic psychological relation." Kostyshyna questioned Vogel's objectivity, asserting Vogel used "improper language" when she made "statements about sexual assault occurring and facts alleging that there was a guilt associated with it." Kostyshyna believed Vogel's statements

indicated confirmation bias. Kostyshyna disagreed with Vogel's conclusion that J.A.W. exhibited the components of PTSD, but she only briefly mentioned "seven components," without addressing them in any detail. No explanation was given for the discrepancy in the number of elements identified by her and Vogel. Kostyshyna testified it was unusual for a "forensic examiner" to conduct an evaluation and recommend treatment because, in her opinion, "You cannot be [a] treater and evaluator for the same case." Kostyshyna testified, "Evaluation cases are usually performed by doctoral-level clinicians," and she criticized Vogel for relying on her examination of J.A.W. without "multiples sources of information, such as testing, collateral interviews, records, and interview [*sic*]." Kostyshyna ultimately concluded, "Based on the methodology used for this case, I would not find this data reliable."

¶ 31        Ultimately, the trial court found several credibility concerns surrounding Kostyshyna's testimony. First, Kostyshyna testified she neither spoke to nor evaluated J.A.W. prior to trial. Kostyshyna also did not review J.A.W.'s trial testimony. Because she had not evaluated J.A.W., Kostyshyna agreed she could not testify as to whether J.A.W. had PTSD. Further, Kostyshyna emphasized she focused exclusively on the purported problems with Vogel's report and testimony, but she did not testify Vogel's PTSD diagnosis was incorrect. In fact, Kostyshyna acknowledged Vogel was qualified to make a PTSD diagnosis, and it was accepted in Vogel's field to reach conclusions without conducting any tests. While Kostyshyna accused Vogel's methodology and language of suffering from confirmation bias, it should come as no surprise that the court lost faith in Kostyshyna's testimony where she demonstrated her own bias by repeatedly referring to J.A.W. as the "alleged victim," even though defendant was convicted of committing two counts of criminal sexual assault against J.A.W. and his convictions were affirmed on direct appeal. See *Hills I*, 2021 IL App (4th) 200220-U, ¶ 49.

¶ 32                    3. *The Trial Court's Findings Were Not Against the*

                          *Manifest Weight of the Evidence*

¶ 33            Against this evidentiary backdrop, defendant asks us to find the trial court's

determination his expert witnesses were not credible during the third-stage hearing and denial of

his postconviction petition was manifest error, meaning "arbitrary, unreasonable, and not based

on the evidence." (Internal quotation marks omitted.) *Phillips*, 2017 IL App (4th) 160557, ¶ 55.

We do not find the court erred. The court's written order shows it thoroughly reviewed all the

material available to it and explained its credibility determinations. Moreover, the court was best

positioned to determine the credibility of defendant's experts during the third-stage hearing, as it

viewed the witnesses and heard their testimony firsthand, considered defendant's arguments, and

ultimately rejected them. See *People v. House*, 2023 IL App (4th) 220891, ¶ 78 ("[T]he trial

court is in the best position to observe and weight the credibility of the witnesses.").

¶ 34            It is not the role of this court to second-guess the trial court based on our own

interpretation of the testimony contained in a cold record. Defendant's burden on appeal is to

show it is "clearly evident" from the record that a conclusion opposite that of the trial court is

true. *Coleman*, 2013 IL 113307, ¶ 98 ("[A] decision is manifestly erroneous when the opposite

conclusion is clearly evident."). He failed to do so. Because the trial court's findings and

credibility determinations were reasonable, we conclude defendant failed to meet his burden. See

*Coleman*, 2015 IL App (4th) 131045, ¶ 65.

¶ 35                    D. Defendant's Ineffective Assistance of Trial Counsel Claims

¶ 36            Finally, defendant argues trial counsel's handling of J.A.W.'s PTSD diagnosis,

the effects of tramadol, ibuprofen, and alcohol, and J.A.W.'s bruising constituted ineffective

assistance. "To prevail on a claim of ineffective assistance of counsel, a defendant must

demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "[A] defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶ 36.

¶ 37 At the third-stage hearing, defendant's trial counsel testified this was his first case where PTSD testimony was being presented in the context of a sexual assault charge. He testified he had "looked at the statute" permitting PTSD testimony in sexual assault cases, though he did not recall the statutory language permitting a defendant to conduct an independent evaluation if the State introduced PTSD testimony based on an evaluation. Counsel did not obtain an independent forensic psychologist to evaluate J.A.W. prior to trial, but he testified this did not prevent him from effectively cross-examining Vogel's methodology. Counsel testified he would have utilized an expert witness critical of the methodology used to reach J.A.W.'s PTSD diagnosis if he had such a witness at his disposal. He likewise would have utilized the testimony of a forensic psychologist who interviewed J.A.W. and reached a different conclusion than Vogel if he had consulted with one.

¶ 38 Trial counsel did not consult an expert witness on the effects of mixing tramadol, ibuprofen, and alcohol. He could not recall whether he conducted an informal investigation into the issue. Regarding the combined effect of the drugs and alcohol on J.A.W., counsel asserted, "I believe she claimed that it rendered her unable to give consent. Beyond that, I don't recall if she—at the time that she was assaulted if she claimed that she was entirely unconscious or if she was semiconscious."

¶ 39    Trial counsel knew he could have petitioned the trial court for funds to investigate the age of J.A.W.'s bruises if he believed such an investigation was necessary. Counsel addressed the bruises in both his opening statement and closing arguments. During his opening statement, counsel said, "[W]hen you see those photographs of that bruising, note the layering and the variety of the colors of those bruises." In his closing argument, he asserted:

> "Look carefully at those pictures because the bruises are very interesting. There are different varieties of colors in that bruising suggesting that it did not occur at one point in time. And a lot of that bruising is overlapping, it's in the same general area, but there are bruises on top of bruises, so please look at that carefully."

¶ 40    The trial court found the issues in question were matters of trial strategy. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 52. Counsel's trial strategy constitutes ineffective assistance only if it is "so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case." (Internal quotation marks omitted.) *Hayes*, 2022 IL App (4th) 210409, ¶ 52. Additionally, "a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). "Twenty/twenty hindsight born from the luxury of time to pore over trial transcripts lends itself to the creation of new defense theories, but that does not necessarily equate to ineffective assistance of trial counsel. Effective assistance of trial counsel requires competent, not perfect representation." *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 107.

¶ 41    The record shows trial counsel conducted a meaningful adversarial testing of the

State's case. Counsel thoroughly and vigorously cross-examined J.A.W., confronting her about why she did not immediately obtain an order of protection against defendant and why she delayed her participation in a forensic examination phone call with an investigator. Counsel cross-examined the nurse who examined J.A.W. at the hospital regarding the lack of vaginal or anal injuries suffered by J.A.W. Counsel cross-examined Vogel regarding her qualifications and the method she used in determining J.A.W. had PTSD. Counsel addressed the issues defendant highlights in his postconviction petition both in his opening statement and his closing argument. Thus, counsel's performance was not objectively unreasonable under prevailing professional norms. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 42       Even if we generously assume defendant's trial counsel performed deficiently, defendant cannot show prejudice. The State presented significant DNA evidence indicating defendant's guilt at trial. The forensic scientist who analyzed the vaginal and anal swabs taken from J.A.W. at the hospital testified male DNA was found at 4 of the 23 locations in the vaginal sample where semen was indicated, 9 of the 23 locations in the nonsperm fraction from the anal swabs, and 19 of 23 locations from the sperm fraction taken from anal swabs. From the mixed fraction taken from the anal swabs during preprocessing, male DNA was extracted from 20 of the 23 locations. All the male DNA findings "were consistent with having originated from the same person." Defendant was identified as a possible contributor of the male DNA found in both the vaginal and anal swabs. The probability someone other than defendant contributed the mixed fraction showing male DNA at 20 of 23 locations "was one in 470 sextillion individuals." Besides the DNA evidence, the jury heard about incriminating texts from defendant later found in J.A.W.'s phone. Based on the overwhelming evidence demonstrating defendant's guilt, there is no reasonable probability the trial's result would have been different but for counsel's

allegedly deficient performance. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 43　　　　All told, this case perfectly exemplifies the pitfalls of looking backward with the benefit of hindsight. An attorney making the pretrial decision whether to obtain an expert witness is differently situated from an attorney combing through a trial transcript and conducting a *post hoc* analysis with experts at their disposal. "Counsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion." *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). We will not find counsel ineffective for not presenting expert testimony unless he failed to subject the State's case to meaningful adversarial testing. *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 46. Here, counsel provided the meaningful adversarial testing to which defendant was entitled, and thus, he did not render ineffective assistance. Indeed, if the experts available to counsel prior to trial were of the same quality as those presented during the third-stage hearing, defendant was better off without them.

¶ 44　　　　　　　　　　III. CONCLUSION

¶ 45　　　　For the reasons stated, we affirm the trial court's order denying defendant's amended petition for postconviction relief.

¶ 46　　　　Affirmed.